IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

STEPHEN THALER, )
 )
      Plaintiff, )
 )
v. ) 1:20-cv-903 (LMB/TCB)
 )
ANDREW HIRSHFELD, Performing the )
  Functions and Duties of the Under Secretary )
  of Commerce for Intellectual Property and )
  Director of the United States Patent and
  Trademark Office, et al.,
 
      Defendants.

MEMORANDUM OPINION

Before the Court are the parties' cross-motions for summary judgment, which address the core issue—can an artificial intelligence machine be an "inventor" under the Patent Act? Based on the plain statutory language of the Patent Act and Federal Circuit authority, the clear answer is no. Accordingly, Defendants' Motion for Summary Judgment [Dkt. No. 23] will be granted and Plaintiff's Motion for Summary Judgment [Dkt. No. 18] will be denied.[1]

I. BACKGROUND

This civil action concerns two patent applications that plaintiff Stephen Thaler ("plaintiff" or "Thaler") filed with the United States Patent and Trademark Office ("USPTO"), which were assigned U.S. Application Serial Nos. 16/524,350 (the "'350 application") and

---

[1] Also before the Court is a document titled as a "Motion to Take Leave to Accept Attached Amicus Curiae Memorandum Opposing MSJ" and a "Motion to Waive Fees" [Dkt. No. 27] filed pro se by Mitchell Apper ("Apper"), who "is an engineer and inventor of a portfolio of 31 inventions that make extensive use of AI and various types of machine learning and is also a registered patent practitioner." [Dkt. No. 27] at 2. The motion will be granted and the amicus brief will be filed; however, the information in the amicus brief is not of help to the Court's evaluation of the legal arguments in this civil action.

16/524,532 (the "'532 application") (collectively, "the Applications").[2] Plaintiff filed the Applications with the USPTO on July 29, 2019. Administrative Record ("AR") 1-96; 284-379. In his one-count complaint brought under the Administrative Procedure Act ("APA"), plaintiff alleges that the refusal of defendants Andrew Hirshfeld and the USPTO (collectively "defendants") to process the Applications was "arbitrary, capricious, an abuse of discretion and not in accordance with the law; unsupported by substantial evidence, and in excess of Defendants' statutory authority." [Dkt. No. 1] ¶ 70. Plaintiff seeks an order compelling defendants to reinstate the Applications and vacate the prior decision on plaintiff's petitions filed under 37 C.F.R. § 1.181. He also seeks "[a] declaration that a patent application for an AI-generated invention should not be rejected on the basis that no natural person is identified as an inventor"; "[a] declaration that a patent application for an AI-generated invention should list an AI where the AI has met inventorship criteria"; and an award of the costs and reasonable attorneys' fees plaintiff incurred in this litigation. [Dkt. No. 1] ¶¶ A-E.

As a civil action brought under the APA, review of the final agency action is limited to considering the administrative record. The factual assertions made by plaintiff during the application process are taken as true. Plaintiff alleges that he "is in the business of developing and applying advanced artificial intelligence (AI) systems that are capable of generating patentable output under conditions in which no natural person traditionally meets inventorship

---

[2] Because the administrative proceedings with respect to the Applications were identical (including the dates on which pertinent events occurred), this Opinion treats the Applications collectively and provides citations to the administrative record that the USPTO has filed with respect to both Applications.

2

criteria," [Dkt. No. 1] ¶ 1, and is the owner of DABUS,[3] an artificial intelligence machine listed as the inventor of the '350 application, which claimed a "light beacon that flashes in a new and inventive manner to attract attention ('Neural Flame')," and the '532 application, which claimed a "beverage container based on fractal geometry ('Fractal Container')." Id. ¶ 15.

In the Application Data Sheets accompanying the Applications, plaintiff identified the inventor's "given name" as "DABUS," and under "family name" wrote "Invention generated by artificial intelligence," identifying his own mailing address as the "mailing address of inventor." AR 10; 299. Plaintiff also included a "Statement on Inventorship" in the Applications explaining that "[t]he unique aspects under which the instant invention was conceived prompted the inclusion of such statement in order to explain that the inventor of the subject matter of the instant invention of the present application is an AI machine, being a type of 'creativity machine' named 'DABUS,'" and arguing why plaintiff thought DABUS should be considered an "inventor" under the Patent Act and the USPTO's regulations. AR 60-65; 345-50.

Because DABUS could not execute the necessary oath or declaration that the Patent Act requires of an inventor, plaintiff included with the Applications a "Substitute Statement Under 37 CFR 1.64 in Lieu of Declaration Under 35 USC § 115(d)," which explained that the "inventor," DABUS, was "under legal incapacity in view of the fact that the sole inventor is a Creativity Machine (i.e., an artificial intelligence), with no legal personality or capability to execute this substitute statement." AR 26-27; 311-12. Accordingly, Thaler, as the "the Applicant and the

---

[3] "DABUS" is an acronym for "Device for the Autonomous Bootstrapping of Unified Sentience." [Dkt. No. 19] at 1.

3

Assignor of the abovementioned application, as well as the owner of said Creativity Machine, DABUS" signed the substitute statement. Id.

The Applications also included a document through which DABUS had ostensibly assigned all intellectual property rights in the claimed invention to plaintiff. That document, entitled "Assignment," provided in pertinent part:

> DABUS, the Creativity machine that has produced the below-detailed invention, as the sole inventor (represented in this assignment by its owner, Stephen L. Thaler, hereinafter called the "Assignor"), hereby assigns and transfers to:
>
> Stephen L. Thaler
> [Address Omitted]
>
> (hereinafter called the "Assignee"), its successors, assignees, nominees, or other legal representatives, the Assignor's entire right, title, and interest, including, but not limited to, copyrights, trade secrets, trademarks and associated good will and patent rights in the Invention and the registrations to the invention . . .
> . . .
> In view of the fact that the sole inventor is a Creativity Machine, with no legal personality or capability to execute said agreement, and in view of the fact that the assignee is the owner of said Creativity Machine, this Assignment is considered enforceable without an explicit execution by the inventor. Rather, the owner of DABUS, the Creativity Machine, is signing this Assignment on its behalf.
>
> Similarly, DABUS, being a machine and having no legal personality, does not have the capability to receive any consideration, and therefore, Stephen L. Thaler, as its owner/representative, acknowledges the receipt and sufficiency of good and valuable consideration for this assignment.

AR 21; 310. The assignment document was signed by both "Stephen L. Thaler, On Behalf of DABUS, Assignor," as well as "Stephen L. Thaler, Assignee." Id.

After its initial review of the Applications, the USPTO issued plaintiff a "Notice to File Missing Parts of Non-Provisional Application," allowing him two months to submit proper information regarding inventorship because the "application data sheet or inventor's oath or

4

declaration does not identify each inventor or his or her legal name." AR 97-98; 380-81. On August 29, 2019, plaintiff filed a petition with the USPTO Director pursuant to 37 C.F.R. § 1.181[4] in which he asked the USPTO to vacate its "Notice to File Missing Parts," and essentially reiterated the "Inventorship Statement" that he had submitted with the Applications arguing that DABUS should be listed as the inventor. AR 111-16; 394-99. On December 17, 2019, the USPTO issued a written decision dismissing plaintiff's petition, in which it explained that the explicit statutory language that Congress has used to define the term "inventor"—e.g., "individual" and "himself or herself"—was uniquely trained on human beings. AR 131-33; 410-12. The USPTO also explained that the Federal Circuit had twice held that an inventor could only be a natural person. Id. (quoting Univ. of Utah v. Max-Planck-Gesellschaft, 734 F.3d 1315, 1323 (Fed. Cir. 2013) ("Max-Planck"); Beech Aircraft Corp. v. Edo Corp., 990 F.2d 1237, 1248 (Fed. Cir. 1993)). "Because a machine does not qualify as an inventor," the USPTO concluded that it had "properly issued the Notice . . . noting the inventor was not identified by his or her legal name." Id. The USPTO further explained the way for plaintiff to patent the inventions:

> the use of a machine as a tool by natural person(s) does not generally preclude natural person(s) from qualifying as an inventor or joint inventors if the natural person(s) contributed to the conception of the claimed invention. See MPEP § 2137.01. . . . Where an application names an incorrect inventor, the applicant could submit a request to correct inventorship under 37 CFR 1.48. See MPEP § 602.01(c) et seq.; see also MPEP § 706.03(a), subsection IV.

AR 133; 412.

---

[4] Pursuant to 37 C.F.R. § 1.181(a)(3), an applicant may file an administrative petition asking the USPTO Director "[t]o invoke the supervisory authority of the Director in appropriate circumstances."

5

On January 20, 2020, plaintiff sought reconsideration of the USPTO's decision by filing a "Petition to the Director Under 37 CFR 1.181 – Request for Reconsideration." AR 135-46; 414-25. On April 22, 2020, the USPTO denied plaintiff's request for reconsideration in a final written decision, which plaintiff challenges in this civil action. AR 205-13; 456-64. Relying on multiple sections of Title 35 of the United States Code, the USPTO explained that "the patent statutes preclude such a broad interpretation" of "inventor" to cover machines. AR 209; 460. Additionally, although the USPTO acknowledged that the relevant Federal Circuit decisions holding that "only natural persons can be 'inventors'" were "in the context of states and corporations," it concluded that "the discussion of conception as being a 'formation in the mind of the inventor' and a 'mental act' is equally applicable to machines and indicates that conception—the touchstone of inventorship—must be performed by a natural person." AR 210; 461 (quoting Max-Planck, 734 F.3d at 1323; Beech Aircraft, 990 F.2d at 1248). The USPTO also pointed to "numerous references to the inventor as a 'person' in Title 37 of the Code of Federal Regulations," and the definition of "conception" in the Manual of Patent Examining Procedure ("MPEP") as "the complete performance of the mental part of the inventive act" and "the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice" as further underscoring that only a natural person may be an "inventor." AR 211; 462. The USPTO addressed plaintiff's remaining arguments, including policy considerations, and held that "they do not overcome the plain language of the patent laws as passed by the Congress and as interpreted by the courts." AR 212; 463 (citing Glaxo Ops. UK Ltd. v. Quigg, 894 F.2d 392, 399-400 (Fed. Cir. 1990) for the holding that the USPTO and courts must honor the plain meaning of the patent statutes when

6

Congress has spoken on an issue, and that striking policy balances when crafting legislative language is within the province of Congress).

Plaintiff filed this civil action seeking review of the USPTO's decision, and, after an agreed briefing schedule was entered, plaintiff and defendants filed their cross-motions for summary judgment without having engaged in discovery. The parties' motions have been fully briefed, and oral argument was heard on the record by teleconference due to the COVID-19 pandemic.

## II. DISCUSSION

### A. Standard of Review

Under the APA, 701 U.S.C. § 701, et seq., a court may only set aside a final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "A court reviewing the agency decision 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Burandt v. Dudas, 528 F.3d 1329, 1332 (Fed. Cir. 2008) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment

7

in weighing relevant factors." Id. "The focal point for judicial review [under the APA] should be the administrative record already in existence." SourceAmerica v. United States Dep't of Educ., 368 F. Supp. 3d 974, 986 (E.D. Va. 2019) (alterations in original) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)), vacated in part on other grounds by 826 F. App'x 272 (2020). Under Fed. R. Civ. P. 56(a), summary judgment is appropriate where the movant shows that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

### B. Analysis

The USPTO argues that its interpretation of the various provisions of the Patent Act at issue here—primarily 35 U.S.C. §§ 100 and 115—is entitled to deference pursuant to the Supreme Court's decision in Skidmore v. Swift & Co., which accords deference to agency interpretations of statutory provisions that "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance to the extent that those decisions have the power to persuade." 323 U.S. 134, 140 (1944). "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id. Similarly, the Federal Circuit has held that

> the Supreme Court intends for us to defer to an agency interpretation of the statute that it administers if the agency has conducted a careful analysis of the statutory issue, if the agency's position has been consistent and reflects agency-wide policy, and if the agency's position constitutes a reasonable conclusion as to the proper construction of the statute, even if we might not have adopted that construction without the benefit of the agency's analysis.

8

Cathedral Candle Co. v. ITC, 400 F.3d 1352, 1366 (Fed. Cir. 2005).

Plaintiff argues that defendants are not entitled to Skidmore deference because defendants did not "consider alternative interpretations or statutory constructions or the constitutional imperative in rejecting the Applications," did not "provide any evidence that Congress intended to exclude AI-[g]enerated [i]nventions from patentability," and did "not engage with the effects of their interpretation." [Dkt. No. 28] at 9. Plaintiff's arguments are rejected because they attempt to add requirements for Skidmore deference that are counter to Supreme Court and Federal Circuit holdings. Contrary to plaintiff's unsupported assertions as to inadequate consideration of "alternative interpretations," the USPTO's interpretation of the Patent Act was carefully considered and was consistent with the Patent Act's language and the caselaw. The decision also explained why plaintiff's policy arguments as to the effects of the agency's interpretation were rejected, and the decision reached a reasonable conclusion regarding the proper construction of the statute. Plaintiff has pointed to no USPTO policies with which the decision is inconsistent. Accordingly, the USPTO's interpretation that an "inventor" must be a natural person is entitled to deference.

Even if no deference were due, the USPTO's conclusion is correct under the law. The question of whether the Patent Act requires that an "inventor" be a human being is a question of statutory construction. Accordingly, the plain language of the statute controls. See, e.g., Shoshone Indian Tribe v. United States, 364 F.3d 1339, 1345 (Fed. Cir. 2004). As the Supreme Court has held: "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.' Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous."

9

BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) (quoting Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-54 (1992)) (internal citations omitted).

Using the legislative authority provided by the Constitution's Patent Clause, see U.S. Const. art. I, § 8, cl. 8, Congress codified the Patent Act in 1952, see Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 180 (1980), and has amended the Patent Act a number of times in the ensuing sixty years. In 2011, Congress promulgated the America Invents Act, which, as relevant here, formally amended the Patent Act to provide an explicit statutory definition for the term "inventor" to mean "the individual, or, if a joint invention, the individuals collectively who invented or discovered the subject matter of the invention." 35 U.S.C. § 100(f). The America Invents Act also added that "joint inventor" means "any one of the individuals who invented or discovered the subject matter of a joint invention." Id. § 100(g). Additionally, Congress has required that "[a]n application for patent shall be made, or authorized to be made, by the inventor . . . in writing to the Director." 35 U.S.C. § 111(a)(1). "[E]ach individual who is the inventor or a joint inventor of a claimed invention in an application for patent shall execute an oath or declaration in connection with the application" which "shall contain statements that— . . . such individual believes himself or herself to be the original inventor or joint inventor of [the] claimed invention." Id. § 115(b). An applicant may also submit a "substitute statement" to the USPTO "in lieu of" the oath or declaration:

> A substitute statement under paragraph (1) is permitted with respect to any individual who—
>     (A) is unable to file the oath or declaration under subsection (a) because the individual—
>         (i) is deceased;
>         (ii) is under legal incapacity; or
>         (iii) cannot be found or reached after diligent effort; or

10

> (B) is under an obligation to assign the invention but has refused to make the oath or declaration required under subsection (a).

Id. § 115(d)(2). The "substitute statement" must also "identify the individual to whom the statement applies" as well as the circumstances triggering the exception to the oath or declaration requirement. Id. § 115(d)(3).

As the statutory language highlights above, both of the definitions provided by Congress for the terms "inventor" and "joint inventor" within the Patent Act reference an "individual" or "individuals." 35 U.S.C. §§ 100(f)-(g). Congress used the same term—"individual"—in other significant provisions of the Patent Act which reference an "inventor," including requiring that "each individual who is the inventor or a joint inventor" execute an oath or declaration, and permitting a substitute statement in lieu of the oath or declaration "with respect to any individual who" meets the requirements. Id. § 115(a)(1). Similarly, the oath or declaration must contain a statement that "such individual believes himself or herself to be the original inventor or joint inventor of [the] claimed invention." Id. § 115(b)(2). Accordingly, the issue of whether an artificial intelligence machine can be an "inventor" turns on the plain meaning of the statutory term "individual."

The Supreme Court recently conducted a statutory construction analysis regarding Congress's use of the term "individual" in the Torture Victim Protection Act ("TVPA"), ultimately concluding that "[t]he ordinary meaning of the word, fortified by its statutory context," referred to a "natural person[]." Mohamad v. Palestinian Auth., 566 U.S. 449, 453-54 (2012). Although the TVPA and Patent Act concern different subject matter, the Supreme Court's statutory analysis of the term "individual" remains applicable here. "Because the [Patent

11

Act] does not define the term 'individual,' we look first to the word's ordinary meaning." Id. at 454. When used "[a]s a noun, 'individual' ordinarily means '[a] human being, a person.'" Id. (quoting 7 Oxford English Dictionary 880 (2d ed. 1989)) (also citing Random House Dictionary of the English Language 974 (2d ed. 1987) ("a person"); Webster's Third New International Dictionary 1152 (1986) ( "a particular person")). As the Supreme Court recognized, these definitions accord with "how we use the word in everyday parlance":

> We say "the individual went to the store," "the individual left the room," and "the individual took the car," each time referring unmistakably to a natural person. And no one, we hazard to guess, refers in normal parlance to an organization as an "individual." Evidencing that common usage, this Court routinely uses "individual" to denote a natural person, and in particular to distinguish between a natural person and a corporation.

Id. Similarly, the Patent Act uses the term "individual" as a noun, and therefore "'individual' ordinarily means '[a] human being, a person.'" Id. at 454. As in Mohamed, this definition is consistent with the ordinary usage of the term "individual" to refer to a human being, as artificial intelligence machines or systems are not normally referred to as "individuals" in ordinary parlance.

Relying on the Dictionary Act's denotation of "individual" as "distinct from the list of artificial entities that precedes it," the Supreme Court explained that "Congress does not, in the ordinary course, employ the word any differently" from its common usage. Id. (citing 1 U.S.C. § 1). The Dictionary Act applies to all congressional enactments, and similarly applies to the Patent Act. See Ngiraingas v. Sanchez, 495 U.S. 182, 190 (1990) (holding that the Dictionary Act "supplied[s] rules of construction for all legislation"). Notably, although "Congress remains free, as always, to give the word a broader or different meaning . . . . before we will assume it

has done so, there must be some indication Congress intended such a result. Mohamad, 566 U.S. at 455 (emphasis in original).

Congress's use of the term "individual" in the Patent Act strengthens the conclusion that an "inventor" must be a natural person. Congress provided that in executing the oath or declaration accompanying a patent application, the inventor must include a statement that "such individual believes himself or herself to be the original inventor or an original joint inventor of a claimed invention in the application." 35 U.S.C. § 115(b)(2) (emphasis added). The Supreme Court has recognized the principle that "a word is known by the company it keeps (the doctrine of noscitur a sociis)" and that this principle is a "rule we rely upon to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995) (quoting Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961)). By using personal pronouns such as "himself or herself" and the verb "believes" in adjacent terms modifying "individual," Congress was clearly referencing a natural person. Because "there is a presumption that a given term is used to mean the same thing throughout a statute," the term "individual" is presumed to have a consistent meaning throughout the Patent Act. Mohamad, 566 U.S. at 456. As the USPTO correctly observes, plaintiff relies on no statutory text within the Patent Act to support his argument that Congress intended to deviate from the typical use of "individual" as meaning a natural person. Instead, plaintiff argues that "[e]ven if statutory and judicial language refers to inventors as individuals, none of this has been in the context of AI-[g]enerated [i]nventions." [Dkt. No. 19] at 17. That argument does not undercut that the ordinary meaning of

13

the word "individual," fortified by its statutory context, refers to natural persons, which necessarily excludes artificial intelligence machines.

This conclusion is further buttressed by the Federal Circuit's consistent holdings that under current patent law "inventors must be natural persons." Max-Planck, 734 F.3d at 1323; see also Beech Aircraft, 990 F.2d at 1248. In Max-Planck, the Federal Circuit evaluated whether a state was the real party in interest where a state university sued officials of another state university (but not the university itself) to correct inventorship of a patent. In holding that "a State has no core sovereign interest in inventorship," the Federal Circuit stated that "[i]t is axiomatic that inventors are the individuals that conceive of the invention: [c]onception is the touchstone of inventorship," and that "[t]o perform this mental act [of conception], inventors must be natural persons and cannot be corporations or sovereigns." 734 F.3d at 1323. In Beech Aircraft, the Federal Circuit stated that a corporation "could never have been declared an 'inventor,' as [the corporation] was merely a corporate assignee and only natural persons can be 'inventors.'" 990 F.2d at 1248 (citing 35 U.S.C. §§ 115–118). Although these cases did not squarely address the issue raised in this civil action, the unequivocal statements from the Federal Circuit that "inventors must be natural persons" and "only natural persons can be 'inventors'" support the plain meaning of "individual" in the Patent Act as referring only to a natural person and not to an artificial intelligence machine. Max-Planck, 734 F.3d at 1323; Beech Aircraft, 990 F.2d at 1248.

Having neither facts nor law to support his argument, plaintiff's main argument is that policy considerations and the general purpose of the Constitution's Patent Clause and the Patent

14

Act require that the statute be read to encompass artificial intelligence machines as "inventors." Plaintiff argues that:

> Allowing patents for AI-Generated Inventions will result in more innovation. It will incentivize the development of AI capable of producing patentable output by making that output more valuable. . . . Patents also incentivize commercialization and disclosure of information, and this incentive applies with equal force to a human and an AI-Generated Invention. By contrast, denying patent protection for AI-Generated Inventions threatens to undermine the patent system by failing to encourage the production of socially valuable inventions.
>
> Patent law also protects the moral rights of human inventors and listing an AI as an inventor where appropriate would protect these human rights. . . . [I]t will discourage individuals from listing themselves as inventors without having contributed to an invention's conception merely because their name is needed to obtain a patent. Allowing a person to be listed as an inventor for an AI-Generated Invention would not be unfair to an AI, which has no interest in being acknowledged, but allowing people to take credit for work they have not done would devalue human inventorship.

[Dkt. No. 19] at 11-12. Accordingly, plaintiff argues that the Court should seek to give effect to Congress's intent "to create a system that would encourage innovation, as well as to promote disclosure of information and commercialization of new technologies." Id. at 12. Plaintiff provides no support for his argument that these policy considerations should override the plain meaning of a statutory term. Moreover, the Supreme Court has held that there must be "some indication" that Congress intended a particular provision to be one of the "rare statute[s]" that contains a different meaning for the term "individual." Mohamad, 566 U.S. at 455 (emphasis in original). Accordingly, plaintiff's position that the USPTO must "provide . . . evidence that Congress intended to prohibit patents on AI-[g]enerated [i]nventions" has the burden exactly backwards. [Dkt. No. 28] at 12.

The Supreme Court and Federal Circuit have explicitly held that policy considerations cannot overcome a statute's plain language, and that "[m]atters of policy are for Congress, not

15

the courts, to decide." Fisons PLC v. Quigg, 876 F.2d 99, 101 (Fed. Cir. 1989)[5]; Sandoz Inc. v. Amgen Inc., 137 S. Ct. 1664, 1678 (2017) ("Even if we were persuaded that Amgen had the better of the policy arguments, those arguments could not overcome the statute's plain language, which is our 'primary guide' to Congress' preferred policy."); see also Kimble v. Marvel Entm't, LLC, 576 U.S. 446, 463-64 (2015) (holding that, although one litigant "also [sought] support from the wellspring of all patent policy: the goal of promoting innovation[,] . . . . [c]laims that a statutory precedent has serious and harmful consequences for innovation are (to repeat this opinion's refrain) more appropriately addressed to Congress").

In response to plaintiff's accusations that the USPTO has not considered the policy ramifications of its decision that an artificial intelligence machine cannot be an "inventor," the USPTO represents that it "continues to study the impact of artificial intelligence on current patent regulations, and has engaged the public-at-large in a conversation on the subject." [Dkt. Nos. 24, 25] at 21 n.10. Specifically, the USPTO points to a conference on artificial intelligence policy it held in January 2019, and to requests for public comment "on a whole host of issues related to the intersection of intellectual property policy and artificial intelligence" it issued in August and October 2019. In October 2020, the USPTO issued a comprehensive report on those

---

[5] Specifically, the Supreme Court held:

> Fisons makes what can only be characterized as a "policy argument" pointing to statements of lofty goals indicating that Congress broadly sought to encourage pharmaceutical innovation by enacting the 1984 Act. . . . It is irrelevant, however, that we might agree with Fisons that, as a matter of policy, Congress might better achieve its goals through a more liberal grant of patent term extension benefits. Matters of policy are for Congress, not the courts, to decide.

Fisons PLC v. Quigg, 876 F.2d 99, 101 (Fed. Cir. 1989).

16

comments. Id. (citing Public Views on Artificial Intelligence and Patent Policy, available at https://www.uspto.gov/sites/default/files/documents/USPTO_AI-Report_2020-10-07.pdf (visited August 31, 2021). Many commentators disagreed with plaintiff's view that artificial intelligence machines should be recognized as inventors—for example, the report found general themes among the comments that:

> The majority of public commenters, while not offering definitions of [artificial intelligence ("AI")], agreed that the current state of the art is limited to "narrow" AI. Narrow AI systems are those that perform individual tasks in well-defined domains (e.g., image recognition, translation, etc.). The majority viewed the concept of artificial general intelligence (AGI)—intelligence akin to that possessed by humankind and beyond—as merely a theoretical possibility that could arise in a distant future.
>
> Based on the majority view that AGI has not yet arrived, the majority of comments suggested that current AI could neither invent nor author without human intervention. The comments suggested that human beings remain integral to the operation of AI, and this is an important consideration in evaluating whether IP law needs modification in view of the current state of AI technology.

Id. at ii-iii; see also id. at 6.

Additionally, the USPTO points to the fact that, contrary to plaintiff's assertion that the "statutes relied upon by Defendants were passed long before AI-[g]enerated [i]nventions were a reality" and that if Congress had contemplated this artificial intelligence issue, it would have included artificial intelligence machines within the definition of "inventors"; Congress defined an "inventor" as an "individual" through the America Invents Act in 2011, when artificial intelligence was already in existence. See Pub. L. 112-29, § 3(a), 125 Stat. 285 (Sept. 16, 2011); see also H.R. Rep. No. 112-98 (June 1, 2011), available at 2011 U.S.C.C.A.N. 67, 67. Accordingly, plaintiff's policy arguments do not override the overwhelming evidence that Congress intended to limit the definition of "inventor" to natural persons. As technology evolves,

17

there may come a time when artificial intelligence reaches a level of sophistication such that it might satisfy accepted meanings of inventorship. But that time has not yet arrived, and, if it does, it will be up to Congress to decide how, if at all, it wants to expand the scope of patent law.

### III. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment [Dkt. No. 23] will be granted, Plaintiff's Motion for Summary Judgment [Dkt. No. 18] will be denied, and Apper's Motion to Take Leave to Accept Attached Amicus Curiae Memorandum Opposing MSJ and Motion to Waive Fees [Dkt. No. 27] will be granted by an Order to be issued with this Memorandum Opinion.

Entered this 2nd day of September, 2021.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge